**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-01573-CMA

In re: ADAM AIRCRAFT INDUSTRIES, INC.

      Debtor.

JEFFREY A. WEINMAN, as Chapter 7 Trustee,

      Appellant,

v.

CITY OF PUEBLO, Colorado, et al.,

      Appellee.

---

**ORDER AFFIRMING IN PART AND REVERSING IN PART
BANKRUPTCY COURT'S ORDERS**

---

This matter is before the Court on Chapter 7 Trustee Jeffrey A. Weinman's (the "Trustee") Appeal of the Bankruptcy Court's final orders, entered on March 23, 2012 and May 30, 2012, in adversary proceeding No. 09-1481.[1] The City of Pueblo ("Pueblo") and George F. Adam, Jr. ("Adam") jointly oppose the Trustee's appeal. Additionally, Pueblo and Adam have filed a Cross-Appeal of the Bankruptcy Court's final orders. The Court has jurisdiction over these appeals from the final orders of the Bankruptcy Court. *See* 28 U.S.C. § 158(a)(1).

---

[1]  Both of the Bankruptcy Court's orders are included in the record submitted by the parties in this appeal. (*See* Doc. # 11-1.) For the remainder of this Order, the Court will use the convention (Rec. at _____) to cite to the record located at Doc. # 11-1. The Court will use the convention (Tr. at _____) to cite to the trial transcript located at Doc. # 11-2.

# I. BACKGROUND[2]

## A.   THE DEBTOR'S CHAPTER 7 BANKRUPTCY

Adam Aircraft Industries, Inc. (the "Debtor") was engaged in the design and manufacture of carbon composite aircraft and airframes.  (Rec. at 151.)  The Debtor operated facilities in Centennial, Colorado, Pueblo, Colorado, and Ogden, Utah.  (*Id.*)

On February 1, 2003, the Debtor and Pueblo entered into a financing agreement to facilitate the Debtor's expansion in Pueblo.  The agreement provided that Pueblo would loan up to $1.74 million to the Debtor for the purchase of equipment.  (*Id.*)  This advance was personally guaranteed by Adam, then the CEO of the Debtor, and it was secured by all equipment and after-acquired equipment at the Pueblo facility (the "Pueblo Collateral").  (*Id.*)  Pueblo perfected its security interest in the Pueblo Collateral by filing its UCC-1 statements with the Delaware Secretary of State on or about February 3, 2003, February 3, 2005, and a continuation statement on or about January 17, 2008.  (*Id.* at 83.)

In January of 2008, Pueblo formally declared the Debtor in default and sued Adam in state court on his personal guaranty.  (*Id.* at 151.)  Shortly thereafter, on February 15, 2008, the Debtor filed a voluntary petition for Chapter 7 bankruptcy relief. (*Id.*)  In its Schedule B, the Debtor listed all of its property as having the value of $24,402,961.01, with the Pueblo Collateral having a value of $898,560.15.[3]  (*Id.* at 83.)

---

[2]   The following facts are taken from the Bankruptcy Court's March 23, 2012 Order (Rec. at 150-161), the facts that the parties stipulated to prior to trial, (*id.* at 81-88), from the transcript of the trial, and from the Asset Purchase Agreement and Sale Order.  (Doc. # 16-20.)

[3]   The parties agree that the Pueblo County Treasurer's records as of April 30, 2007 reflect the "original cost" of the Pueblo Collateral as $1,086,399.00.  (Rec. at 86.)  For tax years 2007 and

In its Schedule D, the Debtor listed Pueblo's secured claim as being $1,665,801.93, and total secured claims as $72,291,056.75.  (*Id.* at 83-84.)

On March 14, 2008, less than a month after the Debtor filed for Chapter 7 relief, the Trustee filed a Motion to Sell Substantially All Assets Free and Clear of Liens, Claims, and Interests pursuant to 11 U.S.C. §363(f) ("Sale Motion").  (Doc. # 16-19 at 3.)  Although Pueblo initially objected to the sale, Pueblo eventually consented to the sale through its Stipulation with City of Pueblo Concerning Trustee's Sale Motion ("Stipulation").  (Doc. # 16-19.)  The following paragraphs of the Stipulation are particularly relevant to this appeal:

1.　¶2: "The Trustee and Pueblo reserve all rights they have with respect to the Pueblo [Collateral] and sale proceeds."

2.　¶3: "The liens, if any, of Pueblo shall attach to the sale proceeds under 11 U.S.C. §363(e), with the same validity, priority, force and effect that they currently have in the Pueblo [Collateral]. . . ."

3.　"This Stipulation is otherwise without prejudice to any rights, claims and interests of the Trustee and Pueblo under applicable law.  The parties reserve their respective rights as to the validity, priority, or amount of the secured claim of Pueblo, Pueblo's claim in the Debtor's bankruptcy case, the security interest held by the [*sic*] Pueblo in the Pueblo [Collateral] and the proceeds thereof."

4.　¶5: "The Trustee reserves the right to seek to surcharge Pueblo's collateral, if appropriate, pursuant to Bankruptcy Code § 506(c), and Pueblo reserve [*sic*] its right to oppose any such request."

(Doc. # 16-19)

---

2008, those records indicate that the assessed value on the Pueblo Collateral was $219,350.00 based on an actual value of $756,330.00.  (*Id.*)

On April 9, 2008, the Bankruptcy Court entered an order ("Sale Order")

authorizing and approving the sale to AAI Acquisition, Inc. of substantially all of the

Debtor's assets for $10 million pursuant to the terms of the Asset Purchase Agreement.

(Doc. # 16-20.)  The following paragraphs of the Sale Order are particularly relevant to

this appeal:

1.    ¶5: "the Trustee is authorized and empowered to, and shall take
      any and all actions necessary or appropriate to (i) consummate the
      Sale of the Acquired Assets to the Purchaser pursuant to and in
      Accordance with the terms and conditions of the Asset Purchase
      Agreement . . ."

2.    ¶10: "All alleged Liens and Claims in the Acquired Assets shall be
      transferred, affixed and attached to the proceeds of the Sale, with
      the same validity, priority, force and effect as such Liens and
      Claims had immediately prior to the Closing, notwithstanding and
      regardless of any Purchase Price allocation agreed to between
      the Trustee and Purchaser in connection with the Asset Purchase
      Agreement.  Nothing in this Order will determine the value of any
      specific Acquired Asset or the validity, priority or amount of any
      Claims or Liens."

(Doc. # 16-20, at 11, 13.)

At the time of its purchase, AAI Acquisition intended to use the Debtor's assets to

operate as a going concern.[4]  (Rec. at 85.)  Paragraph 3.2 of the Asset Purchase

Agreement provided that the purchase price of $10 million "shall be allocated among the

Acquired Assets at Debtor's Centennial, Colorado, [sic] facilities and those at its Pueblo,

---

[4]   The term "going concern" is commonly understood to refer to "[a] commercial enterprise
actively engaging in business with the expectation of indefinite continuance."  Black's Law
Dictionary (9th ed. 2009).  "In the valuation context, it is generally used in contradistinction to
a business that will be liquidated.  Essentially, it requires an appraisal to assume the continued
operation of the same type and size of business . . . and to exclude consideration of any merger
or liquidation."  *Cox Enters., Inc. v. News-Journal Corp.*, 510 F.3d 1350, 1358 (11th Cir. 2007).

Colorado, [*sic*] facility, and otherwise in accordance with Schedule 3.2, to be agreed

upon by the Seller and Purchaser and attached hereto prior to the Closing." (Doc. #16-

20 at 28-29).  However, neither AAI Acquisition nor the Trustee ever complied with that

allocation requirement, nor were any physical inspections or formal appraisals of the

Pueblo Collateral completed prior to the sale.  (Rec. at 86-87, 152-53.)

On June 30, 2008, Pueblo filed a proof of claim asserting secured and unsecured

claims totaling $2,281,083.00, of which $1,360,726.00 was designated as secured.  (*Id.*

at 84.)

**B.    THE ADVERSARY PROCEEDING**

On August 11, 2009, the Trustee initiated an adversary proceeding against

thirteen defendants seeking a determination as to the extent, validity, and priority of

the liens and secured claims asserted by the defendants under 11 U.S.C. § 506 of the

Bankruptcy Code.[5]  (*Id.* at 28-29.)  The Trustee also sought allowance of a surcharge

against the defendants' secured collateral under § 506(c) for what he alleges were

the reasonable and necessary costs and expenses of preserving and disposing of the

property securing the defendants' claims.  (*Id.* at 29.)  The Trustee eventually resolved

the competing claims of all defendants except for those of Pueblo.

---

[5] All future statutory references in this Order are to the Bankruptcy Code, Title 11 of the United States Code.

A one-day trial was held before the Bankruptcy Court on June 16, 2011.[6]  The

Trustee presented two witnesses at trial: himself and the former Chief Financial Officer

of the Debtor, Chris Naro.  The Trustee testified that he had no experience in the aircraft

manufacturing business, and that he had not formed a personal opinion as to the value

of the Pueblo Collateral.  (Tr. at 34:21-22; 75:20-76:5.)  Mr. Naro testified that he

believed that the Pueblo Collateral was worth $550,000.  (*Id.* at 106:7-9.)  Essentially,

this figure represented a 40% discount on the scheduled acquisition price (*i.e.*, the

original purchase price).  (Rec. at 158 n.36.)  Mr. Naro testified that this figure was

based on the assumption that the company would cease to operate, rather than being

sold to a purchaser as a going concern.  (Tr. at 145:5-22.)

Pueblo and Adam also presented two witnesses at trial: Adam and Gary Steffen,

a former personal property tax appraiser for Arapahoe County retained by the Debtor

to assist in the preparation of its tax returns.   Consistent with the stipulated facts,

Mr. Steffen testified that the Pueblo County Treasurer's tax assessment for 2006

reflected an assessed value of the personal property at the Debtor's Pueblo facility of

$219,350, which equates to an actual value of $756,330.  (*Id.* at 190:12-15; Rec. at 86.)

Adam testified that the Pueblo Collateral had a minimum value of between $1 million

and $1.2 million, if sold piecemeal.  (Tr. at 217:5-7.)

---

[6]   In March of 2010, Adam entered into a Mediated Settlement Agreement with Pueblo in the
pending state court action, confessing judgment of $1,860,000.00.  Under the terms of the
Mediated Settlement Agreement, if Adam pays the sum of $1,500,000.00, the confessed
judgment is deemed satisfied.  (Rec. at 87.)  After the state court entered judgment against
Adam, the Bankruptcy Court granted Adam's unopposed motion to intervene as a defendant
in the adversary proceeding.

**C.     THE BANKRUPTCY COURT'S ORDERS**

On March 23, 2012, after receiving post-trial written closing arguments, the
Bankruptcy Court issued its Order Valuing Pueblo Collateral, Allowing Partial
Surcharge, and Determining Priority of Tax Lien (the "March 23, 2012 Order").[7]  (Rec.
at 150-160.)  In the March 23, 2012 Order, the Bankruptcy Court explained that its task
was to determine the value of the Pueblo Collateral under § 506(a) "for the purpose of
deciding how much of the Sales Proceeds should be allocated to Pueblo on account of
its claim secured by the Pueblo Collateral."  (*Id.* at 154.)  Before discussing the relevant
valuation evidence, the Bankruptcy Court stated that the proper standard for valuing the
Pueblo Collateral, as directed by the United States Supreme Court, was "replacement
value."  (*Id.* at 154-55) (citing *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953 (1997)).
Applying a replacement value standard, the Bankruptcy Court found that the Pueblo
Collateral had a value of $898,560.15, which was the amount listed in the Debtor's
Schedule B.  (*Id.* at 158.)  Although the Bankruptcy Court acknowledged that the
amount was "less than ideal because it is an estimate and is not based on a careful
independent appraisal of each piece of property as it existed before the sale," it
nonetheless found that the Schedule B listing was the "most reliable of several
unreliable sources."  (*Id.*)  After deducting the senior tax lien of the Pueblo County
Treasurer ($30,000) and allowing the Trustee a § 506(c)  surcharge claim of 17.75%,
the Bankruptcy Court awarded Pueblo the net sum of $709,065.72 on account of its lien
interest in the asset sale proceeds.  (*Id.* at 159-160.)

---

[7]     The March 23, 2012 Order is also located on Westlaw at *In re Adam Aircraft Industries, Inc.*,
Adversary No. 09-1481, 2012 WL 993477 (Bankr. D. Colo. Mar. 23, 2012) (unpublished).

The Trustee filed a Motion to Alter or Amend the Judgment.  (*Id.* at 194.) On May 30, 2012, the Bankruptcy Court issued its Order Denying in Part and Granting in Part Trustee's Motion to Alter or Amend Judgment (the "May 30, 2012 Order").[8] (*Id.* at 194-198.)  In the May 30, 2012 Order, the Bankruptcy Court found that the Trustee had not stated grounds to alter the Bankruptcy Court's valuation of the Pueblo Collateral.  (*Id.* at 197-198.)  However, the Bankruptcy Court increased the Trustee's § 506(c) surcharge from 17.75% to 18.00%, thus decreasing the net sum awarded to Pueblo to $706,819.32.  (*Id.* at 198.)  The Bankruptcy Court entered Judgment on May 30, 2012.  (*Id.* at 204.)

The Trustee initiated this action by filing a Notice of Appeal on June 18, 2012. (Doc. # 1.)  Nine days later, Pueblo and Adam filed a Notice of Cross Appeal.  (Doc. # 7.)  The Trustee filed his opening brief on August 2, 2012.  (Doc. # 16.)  On August 28, 2012, Pueblo and Adam responded to the Trustee's brief and submitted their opening brief on cross appeal.  (Doc. # 19.)  The Trustee replied to Pueblo's response, and responded to Pueblo and Adam's opening brief on cross on appeal, on September 11, 2012.  (Doc. # 20.)  Pueblo and Adam filed their reply on cross appeal on September 28, 2012.  (Doc. # 22.)

---

[8]   The May 30, 2012 Order is also located on Westlaw at *In re Adam Aircraft Industries, Inc.*, Adversary No. 09-1481, 2012 WL 1945378 (Bankr. D. Colo. May 30, 2012) (unpublished).

## II.  STATEMENT OF ISSUES AND STANDARD OF REVIEW

The Trustee raises two issues in his appeal: (1) whether the bankruptcy court erred in applying the "replacement value"[9] standard set forth by the Supreme Court in *Rash* and (2) whether the Bankruptcy Court erred in failing to apportion or allocate the value of the Pueblo Collateral.

The issue raised in Pueblo and Adam's cross-appeal is whether the Bankruptcy Court erred by applying a surcharge of 18% on Pueblo's secured claim rather than requiring the Trustee to show the expenses specifically incurred to preserve or dispose of the collateral securing the Pueblo lien.

The Bankruptcy Court's factual findings are subject to a clearly erroneous standard.  *In re Baldwin*, 593 F.3d 1155, 1159 (10th Cir. 2010).  Its legal conclusions are reviewed *de novo*.  *Id*.  Mixed questions consisting primarily of legal conclusions drawn from the facts are also reviewed *de novo*.  *In re Rafter Seven Ranches L.P.*, 546 F.3d 1194, 1200 (10th Cir. 2008).

## III.  ANALYSIS

### A.    THE TRUSTEE'S APPEAL

The Trustee contends that the Bankruptcy Court's $898,560.15 valuation of the Pueblo Collateral was erroneous for two reasons.  First, the Trustee argues that the Bankruptcy Court erred by applying a "replacement value" standard to determine the value of the Pueblo Collateral.  Second, the Trustee argues that, even if a replacement

---

[9]  The Supreme Court has defined "replacement value" to mean "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Rash*, 520 U.S. at 960.

value standard is appropriate, the Bankruptcy Court erred by failing to apportion or
allocate the value of the Pueblo Collateral to the actual proceeds realized from the sale
of the Debtor's assets to AAI Acquisition.  The Court considers these arguments in turn.

      1.   <u>Whether the Bankruptcy Court Erred by Applying a Replacement Value
Standard</u>

The Trustee's first argument is that the Bankruptcy Court erred by valuing the
Pueblo Collateral under a "replacement value" standard.  Because this is an issue of
law, the Court reviews the Bankruptcy Court's use of the replacement value standard
*de novo.*

Section 506(a) calls for the division of a secured creditor's claim into "secured
and unsecured portions, with the secured portion of the claim limited to the value of
the collateral."  *Rash*, 520 U.S. at 961.  The statute provides that the value of property
"shall be determined in light of the purpose of the valuation and of the **proposed
disposition or use** of such property . . . ."  § 506(a) (emphasis added).  However,
§ 506(a) "does not specify the appropriate valuation standard."  *In re Heritage Highgate,
Inc.*, 679 F.3d 132, 141 (3d Cir. 2012).  Rather, "Congress envisioned a flexible
approach to valuation whereby bankruptcy courts would choose the standard that
best fits the circumstances of a particular case."  *Id.*

In its March 23, 2012 Order, the Bankruptcy Court wrote that "the United States
Supreme Court [in *Rash*] has stated a foreclosure or distressed-sale standard is
inappropriate for purposes of § 506(a), and directs the proper standard is 'replacement
value.'"  (Rec. at 154-155) (citing *Rash*, 520 U.S. at 959-960).  As the Trustee asserts,

the Bankruptcy Court overstated the holding of *Rash*.[10]  *See, e.g.*, *In re Weber*, 332 B.R.

432, 436 (10th Cir. B.A.P. 2005) ("[n]owhere in [*Rash*] does the Supreme Court hold

that **all** valuations under § 506 must be based on a replacement value standard.")

(emphasis in original).  In *Rash*, the Supreme Court held that a replacement value

standard should be used to value property under § 506(a) when a Chapter 13 debtor

exercises the "cram down" option available under § 1325(a)(5)(B).[11]  *See Rash*, 520

U.S. at 960.  *Rash* noted that the "proposed disposition or use" language in § 506(a)

was of "paramount importance to the valuation question."  520 U.S. at 962.  Because

the Bankruptcy Court asserted that a replacement value standard is always required

under § 506(a), the Trustee contends that the Bankruptcy Court failed to consider the

"proposed disposition or use" of the Pueblo Collateral as required under *Rash*.

    In *Rash*, the Supreme Court explained that courts should not apply a foreclosure

value standard when a debtor invokes the cram down option because application of

such a standard "attributes no significance to the different consequences of the debtor's

choice to surrender the property or retain it."  *Id.*  By contrast, using a replacement value

standard in the cram down context "values 'the creditor's interest in the collateral in light

of the proposed [repayment plan] reality: no foreclosure sale and economic benefit for

the debtor derived from the collateral equal to . . . its [replacement] value.'"  *Id.* at

---

[10]  Pueblo and Adam concede this point, agreeing that "[c]onceptually . . . *Rash* does not mandate in all circumstances that collateral be valued at replacement value."  (Doc. # 19 at 13.)

[11]  A "cram down" occurs when a Chapter 13 debtor elects to keep possession of a secured creditor's collateral when the secured creditor does not accept the debtor's Chapter 13 reorganization plan, rather than surrender the collateral to the creditor.  *See Rash*, 520 U.S. at 962.

963(quoting *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 75 (1st Cir. 1995)) (alterations in original).

Although *Rash* was decided in the narrow context of an individual debtor's Chapter 13 reorganization, courts have recognized that the logic of *Rash* applies with equal force in other contexts. *See, e.g.*, *Heritage Highgate*, 679 F.3d at 141 ("Courts have recognized that similar reasoning applies with equal force in the Chapter 11 reorganization context"); *In re Castleton Plaza, LP*, No. 10-1444, 2011 WL 4621123, at *3 (Bankr. S.D. Ind. Sept. 30, 2011) (unpublished). Thus, although *Rash* does not dictate the use of a replacement value standard in all § 506(a) valuations as the Bankruptcy Court suggested, it is not as narrow as the Trustee asserts. (Doc. # 16 at 17) (asserting that "*Rash* only determined the proper valuation standard to be used in valuing personal property retained and used by a Chapter 13 debtor under the cram-down provisions . . . .").

The Bankruptcy Court aptly observed in its March 23, 2012 Order that "very little guidance exists for a court attempting to arrive at the appropriate valuation to determine the distribution of proceeds in a case in which sale of the debtor's assets has already taken place." (Rec. at 150.) Indeed, there appears to be a dearth of authority on the proper valuation standard when a debtor sells its assets in bulk to a third-party purchaser as a going concern, as occurred in this case. Despite this lack of authority, the Court finds that the Bankruptcy Court applied the correct valuation standard.[12]

---

[12]   In *Rash*, the Supreme Court considered three possible valuation standards: "(1) what the secured creditor could obtain through foreclosure sale of the property (the 'foreclosure-value' standard); (2) what the debtor would have to pay for comparable property (the 'replacement-value' standard); or (3) the mid-point between these two measurements." 520 U.S. at 955-56.

12

Central to the Court's determination that the Bankruptcy Court applied the correct valuation standard is the undisputed fact that AAI Acquisition purchased substantially all of the Debtor's assets in order to operate the business as a going concern. *See in re LTV Steel Co., Inc.*, 285 B.R. 259, 269 (Bankr. N.D. Ohio 2002) ("[T]he nature and structure of the sale [becomes] a fact dictating the valuation analysis through the application of 506(a)."). "If the "disposition or use" language of § 506(a) is to be afforded any significance, "**the appropriate standard for valuing collateral must depend upon what is to be done with the property** – whether it is to be liquidated, surrendered, or retained by the debtor." *In Re Heritage Highgate*, 679 F.3d at 141 (emphasis added). Because AAI Acquisition bought all of the Debtor's assets in order to continue operations of the company as a going concern, a liquidation value standard would not have been appropriate. *In re Thomas*, 246 B.R. 500, 505 (E.D. Pa. 2000) ("Liquidation value is not a proper measure of a company . . . when the business will continue its operations."); *Cox Enters., Inc. v. News-Journal Corp.*, 510 F.3d 1350, 1358 (11th Cir. 2007) ("In the valuation context, [a going concern] is generally used in contradistinction to a business that will be liquidated."). Although the Debtor in this case did not retain the property for itself, this is a distinction without any meaningful significance in this case because "nothing in the *Rash* . . . decision[ ], or in [§] 506(a), limits the application of 'the proposed disposition or use' of collateral to the debtor's proposed use or disposition." *In re Clarkeies Mkt.*, L.L.C., No. 01-10700, 2002 WL

---

The Supreme Court rejected the third "split-the-difference" valuation standard, suggesting that bankruptcy courts should apply either a replacement value standard or a foreclosure value standard.

31317242, at *4 (Bankr. D.N.H. Sept. 26, 2002) (unpublished).  Thus, the Court finds

that the Bankruptcy Court correctly applied a replacement value standard in valuing the

Pueblo Collateral.

In lieu of the replacement value standard applied by the Bankruptcy Court, the

Trustee argues that the Bankruptcy Court should have ascertained the value of the

Pueblo Collateral through one of four "proportional valuations."[13]  (Doc. # 16 at 19.)

Tellingly, the Trustee offers no authority to support his assertion that the value of the

Pueblo Collateral may be determined via such proportional valuations.  A straight

proportional valuation, as suggested by the Trustee, would bypass the requirement that

each asset be individually valued.  *See LTV Steel*, 285 B.R. at 268 ("Before determining

each asset's portion of the cash proceeds, each asset must be valued.").  As Pueblo

and Adam argue, "the Bankruptcy Court could not simply assume the value of all other

assets of the Debtor . . . and perform 'simple mathematics' based on factors with no

relationship to actual value.'"  (Doc. # 19 at 14.)  Thus, the Bankruptcy Court was right

to reject the Trustee's proposed proportional valuations.

2.      Whether the Bankruptcy Court Erred in Valuing the Pueblo Collateral

After considering the evidence presented at trial, the Bankruptcy Court concluded

that $898.560.15, which was the value of the Pueblo Collateral listed in the Debtor's

Schedule B, "most closely approximate[d]" the value of the Pueblo Collateral.  (Rec. at

159.)

---

[13]     Under these proportional valuations, the Trustee calculates that the Pueblo Collateral
constituted only 2.3% of the Debtor's assets that were sold to AAI Acquisition.  (Doc. # 16
at 19).  Based on the $10 million purchase price for all of the Debtor's assets, the Trustee
contends that the value of the Pueblo Collateral was $230,000.  (*Id.* at 27.)

Relying on *LTV Steel*, The Trustee's second argument is that, even if a replacement value standard was proper, the Bankruptcy Court erred because it failed to apportion the $898.560.15 of the Pueblo Collateral in light of the $10 million bulk sale of the Debtor's assets.  *See LTV Steel*, 285 B.R. at 266 (stating that valuation in the allocation process requires the determination of "the value of an individual asset as a portion of the whole sale.").  However, *LTV Steel* also noted that, "[b]efore determining each asset's portion of the cash proceeds, each asset must be valued."  *LTV Steel*, 285 B.R. at 268.  The apportionment analysis worked in *LTV Steel* because, unlike the instant case, there were competing secured creditors who presented evidence of the value of their collateral.  In the instant case, the Trustee did not present any evidence at trial regarding the valuation of any individual asset other than the Pueblo Collateral.[14] (Rec. at 197.)

---

[14]   The Trustee argues that it was Pueblo and Adam's burden to prove the value of the Pueblo Collateral and, therefore, that it was Pueblo and Adam's responsibility to prove the value of the Pueblo Collateral in proportion to the Debtor's other assets.  However, even assuming that it was Pueblo and Adam's burden to prove the value of the Pueblo Collateral, *see In re Heritage Highgate*, 679 F.3d at 139-140 (discussing three approaches to the burden of proof in § 506(a) valuation proceedings and concluding that a burden-shifting framework was the best approach), it does not follow that Pueblo and Adam also had the burden of proving the value of the non-Pueblo collateral.  The Trustee initiated this adversary proceeding to determine the extent, validity, and priority of the liens and secured claims asserted by Pueblo under § 506.  In this adversary proceeding, the Trustee was, in effect representing the interests of all creditors other than Pueblo. (Doc. # 16 at 27) (arguing that the Bankruptcy Court's findings was "to the detriment of other creditors in the bankruptcy case").  As possessor of the secured collateral prior to the Sale, the Trustee was in a far better position than Pueblo and Adam to ascertain the value of the non-Pueblo collateral.  Moreover, as the Bankruptcy Court emphasized, the Trustee and AAI Acquisition were required by the Asset Purchase Agreement to allocate the value of the different assets included in the Sale at the time of the Sale.  For these reasons, if the Trustee intended to pursue its *LTV Steel* apportionment theory of valuation, then he had the burden of coming forward with sufficient evidence regarding the value of the non-Pueblo collateral,

Although the total value of the Debtor's assets is conclusively set at $10 million because that was "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller," *Rash*, 520 U.S. at 960, the total value of the Debtor's assets provides no information regarding the value of any individual asset included in the sale.  The Trustee's failure to provide evidence regarding the value of the non-Pueblo Collateral prevented the Bankruptcy Court from being able to ascertain the value of any individual asset other than the Pueblo Collateral.  As such, even assuming *arguendo* that an *LTV Steel*-type apportionment would have been appropriate, the Trustee failed to provide the Bankruptcy Court with the evidence needed to conduct such an analysis.

Because the Trustee failed to present valuation evidence for any of the Debtor's other assets, the Trustee seeks to rely on the value of the Pueblo Collateral as proof of the value of the non-Pueblo Collateral.  The Trustee asserts that because the Bankruptcy Court determined that the Pueblo Collateral had a value equal to its scheduled value, the Debtor's non-Pueblo assets also had an actual value equivalent to their scheduled values ($22,622,960).  Because the Debtor's total assets sold for $10 million, the Trustee asserts that the Sale realized only 44.20288% ($10,000,000/ $22,522,960) of the value of all the assets.  Thus, the Trustee argues that the actual value of the Pueblo Collateral was only 44.20288% of the $898.560.15 amount found by the Bankruptcy Court.

What the Trustee overlooks is that, in valuing the Pueblo Collateral, the Bankruptcy Court did not consider only the amount listed in the Debtor's Schedule B.

Rather, the Bankruptcy Court considered the testimony presented at trial, some of which indicated a higher value for the Pueblo Collateral and some of which indicated a lower value.  Only after considering this evidence did the Bankruptcy Court conclude that the Schedule B listing "most closely approximate[d]" the value of the Pueblo Collateral.  Thus, the fact that the Bankruptcy Court found that the value of the Pueblo Collateral was equivalent to its Schedule B listing does not mean that the remainder of the Debtor's assets had an actual value equivalent to that listed in Schedule B.  As the Bankruptcy Court stated in its May 30, 2012 Order, "§ 506 requires distribution to secured creditors based on the actual value of their interest in estate property, not based on a value extrapolated from evidence of the Pueblo Collateral."  (Rec. at 197.)

## B.    PUEBLO AND ADAM'S CROSS-APPEAL

On cross-appeal, Pueblo and Adam contend that the Bankruptcy Court's imposition of an across the board administrative expense surcharge of 18% on the value of the Pueblo Collateral violates the provisions of § 506(c).

Section 506(c) provides that, "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder to such claim." Section 506(c) thus "creates an exception to the general principle of bankruptcy distribution that prefers secured creditors to all other claimants with respect to the proceeds of the secured creditor's collateral . . . ."  *In re Strategic Labor, Inc.*, 467 B.R. 11, 21 (Bankr. D. Mass. 2012); *see also S.E.C. v. McNaul*, No. 08-1159, 2009 WL 3458285, at *1 (D. Kan. Oct. 26, 2009) (unpublished) ("The default rule in bankruptcy

is . . . that administrative expenses are paid out of the estate and not by the secured creditors of the debtor."). To invoke the "extraordinary exception" of § 506(c), a trustee must satisfy three elements: (1) the expenditures were necessary, (2) the amounts expended were reasonable, and (3) the creditor benefitted from the expenses. *McNaul*, 2009 WL 3458285, at *2 (citing *Matter of Delta Towers, Ltd.*, 924 F.2d 74, 76-77 (5th Cir. 1991). The party seeking to impose a 506(c) surcharge on a creditor's collateral has the burden of showing a "concrete" and "quantifiable" benefit to the creditor and recovery is limited to the amount of the benefit actually proven. *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir. 2001)

"Whether a particular expense is necessary, reasonable, and of benefit to the secured creditor is a question of fact, and the bankruptcy court's findings may be overturned only if they are clearly erroneous." *In re Command Techs., Inc.*, No. 94-2181, 1995 WL 642850, at *3 (4th Cir. 1995) (unpublished). However, the issue in this cross-appeal is whether the Bankruptcy Court correctly applied the legal standard contained in § 506(c), and so the Court's review is *de novo*. *In re C.S. Assocs.*, 29 F.3d 903, 905 (3d Cir. 1994).

At trial, the Trustee testified that he incurred $1,813,216.37 in costs and expenses relating to the $10 million sale of the Debtor's assets. (Rec. at 198.) In support of this testimony, the Trustee introduced an exhibit containing all of the deposits and disbursements made by the estate from the date of the bankruptcy petition through August 29, 2008. (Doc. #19-3). It does not appear that the Trustee produced any evidence as to how the expenditures were necessary, reasonable, and of benefit to

Pueblo.  Rather, the Trustee merely asserted that he was entitled to a surcharge of 18%

on the value of the Pueblo Collateral.  (Rec. at 198.)

In its March 23, 2012 Order, with respect to the Trustee's asserted surcharge,

the Bankruptcy Court stated:

> The Court agrees with the Trustee's contention he is entitled to assert
> such expenses in this case.  The Court further agrees with Pueblo and
> Adam that the surcharge appears high.  Although Pueblo and Adam
> dispute the claimed surcharge, they offered no evidence to rebut the
> Trustee's description of the expenses or the percentage requested.
> Therefore, although the Court finds the record on this point less than
> ironclad, it must use the unrebutted evidence before it, and not impose its
> own preference for what the evidence should have been.  Thus, the Court
> finds the Trustee's original assertion of 17.75% as a representation of
> these costs and expenses to be reasonable in this instance.

(*Id.* at 160.)

In its May 30, 2012 Order, with respect to the Trustee's request that the court

increase the amount of the surcharge to 18%, the Bankruptcy Court stated:

> As to the Trustee's assertion he is entitled to a surcharge of 18%, the
> Complaint indicates the Trustee is entitled to a surcharge against each
> of the originally-named defendants in a 'pro rata amount no less than
> 17.75% of the value of the property securing such allowed secured claim.'
> The Trustee's unrebutted testimony was that he incurred $1,813,216.37 in
> costs and expenses of sale – indeed approximately 18% of the $10 million
> sales price.  Based on the Complaint's seeking of "no less" than 17.75%,
> and the failure of Pueblo to offer evidence rebutting the amount or
> reasonableness of the costs and expenses, the Court will grant the
> Trustee's Motion as to the surcharge.

(*Id.* at 198.)

In the March 23, 2012, the Bankruptcy Court indicated that it agreed with Pueblo

and Adam that the surcharge appeared to be high.  In both orders, it nonetheless found

the amount to be reasonable based on the failure of Pueblo to offer evidence rebutting the amount or reasonableness of the costs and expenses.[15]

The Bankruptcy Court did not analyze whether and to what extent the evidence showed that particular expenditures incurred by the Trustee (1) were reasonable and necessary specifically for the preservation or disposition of the Pueblo Collateral, and (2) how each of these expenditures primarily benefitted Pueblo in a "concrete and quantifiable" way.  *In re Felt Mfg. Co., Inc.*, 402 B.R. 502, 523 (Bankr. D.N.H. 2009); *In re Parque Forestal, Inc.*, 949 F.2d 504, 511 (1st Cir. 1991), *overruled on other grounds by Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 350 U.S. 1 (2000); *see also In re Grimland, Inc.*, 243 F.3d 228, 232 (5th Cir. 2001) (stating that "indirect or speculative benefits may not be surcharged, nor may expenses that benefit the debtor or other creditors.").

Moreover, the Bankruptcy Court ignored the fact that many of the expenses included in the $1,813,216.37 figure appear to be general administrative expenses. Absent proof that an expense meets the § 506(c) standard it is inappropriate to treat a general administrative expense as a § 506(c) surcharge:

> [S]urcharges [under 11 U.S.C. § 506(c)] and administrative expenses under the Bankruptcy Code are distinct charges against estate property that serve very different purposes.  Prorating one with another makes no conceptual sense and violates the Code's priority structure.  Compensation for professionals is an administrative expense as defined in 11 U.S.C. § 503 and is an assessment against the estate as a whole because all of the creditors are benefitted.  On the other hand a surcharge under 11 U.S.C. § 506(c) is not an administrative expense.  It is an assessment

---

[15]   This Court does not need to address whether this was an inappropriate burden-shifting by the bankruptcy court because this Court is reversing and remanding the Bankruptcy Court's surcharge finding on other grounds.

against a secured party's collateral as reimbursement for a particular
benefit to such a secured creditor.

In re InteliQuest Media Corp., 326 B.R. 825, 832 (10th Cir. BAP 2005).

It is entirely proper for the Bankruptcy Court to award a surcharge to the

Trustee for costs that were proven to be proper § 506(c) expenditures related to the

preservation and disposition of the Pueblo Collateral.  However, it was error for the

Bankruptcy Court to assess against the Pueblo Collateral a blanket 18% pro rata

surcharge without considering whether specific costs and expenses directly and

primarily benefitted Pueblo, or whether they were § 503 administrative expenses

or expenses that primarily benefitted the non-Pueblo Collateral.[16]

Accordingly, the surcharge award of $ 161,740.83 must be vacated and the case

remanded to the Bankruptcy Court for further proceedings consistent with this Order.

On remand, the Bankruptcy Court should apply the legal standard set forth above.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Orders and

Judgments of the Bankruptcy Court, dated March 23, 2012 and May 30, 2012, are

AFFIRMED IN PART and REVERSED IN PART.

---

[16]   For example, the surcharge evidence presented by the Trustee included rent for a storage
facility in Ogden, Utah that did not house the Pueblo Collateral.  (Doc. # 19-3 at 5.)  The Court
fails to perceive how such an expense could directly benefit Pueblo.  In his Response, the
Trustee asserts that Pueblo was benefitted because the Debtor's assets were purchased as
a going concern.  Although it may be true that Pueblo would have derived some benefit from the
Trustee's preservation of other creditors' collateral, such a benefit is, at most, indirect and
speculative.  See In re Grimland, Inc., 243 F.3d at 232 ("indirect or speculative benefits may
not be surcharged, nor may expenses that benefit the debtor or other creditors.").

Specifically, the Bankruptcy Court's determination that the value of the Pueblo Collateral was $898,560.15 is AFFIRMED.  The Bankruptcy Court's determination that the Trustee is entitled to a surcharge of $161,740.83 against the Pueblo Collateral is REVERSED.

This matter is REMANDED to the Bankruptcy Court to calculate the surcharge award, if any, in accordance with this Order.

DATED:  February   28  , 2013

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge